# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

TERRI FRANCES MURPHY,

|                                  | Plaintiff, |                      |
|----------------------------------|------------|----------------------|
| v.                               |            | 5:13-CV-960          |
|                                  |            | (GTS-ATB)            |
| COMMISSIONER OF SOCIAL SECURITY, |            |                      |
|                                  | Defendant. |                      |

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
FERGUS J. KAISER, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

On October 30, 2009, plaintiff "protectively filed"[1] an application for Supplemental Security Income ("SSI") benefits and, on November 7, 2009, she protectively filed an application for Social Security Disability Insurance Benefits ("DIB").  (Administrative Transcript ("T.") 81, 82, 195, 202, 227, 256).  Plaintiff

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits.  *See* 20 C.F.R. §§ 404.630, 416.340.  There are various requirements for this written statement.  *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

alleged disability, beginning November 6, 2002, involving an "unstable back" and right ankle, knee, and heel problems.  (T. 232).

Plaintiff's applications were initially denied on March 22, 2010.  (T. 108). After a hearing on November 22, 2010, at which plaintiff testified (T. 34-58), Administrative Law Judge ("ALJ") John P. Ramos denied the applications in a decision issued on January 14, 2011 (T. 86-95).  On June 28, 2011, the Appeals Council remanded the case for further administrative proceedings.  (T. 101-03).  On February 22, 2012, ALJ Ramos conducted a second hearing, at which the plaintiff and a vocational expert testified.  (T. 59-79).  ALJ Ramos again denied plaintiff's applications in an opinion dated March 7, 2012 (T. 14-26), which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on June 24, 2013.  (T. 1-4).

## II.  <u>GENERALLY APPLICABLE LAW</u>

### A.  **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless

2

of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. FACTS

As of the date of the first administrative hearing in November 2010, plaintiff was 46 years old. She reported being 5' 5" tall and weighing 217 pounds. (T. 37). Plaintiff completed tenth grade, and had not earned a GED. (T. 38). She resided with her husband and three children, who were between 18 and 23 years of age. (T. 37). She acknowledged that she could generally care for herself and do some shopping, cooking, and certain household chores, although she could not stand or sit for very long without moving, could not lift heavy items, and could not bend without pain. (T. 41-45). Plaintiff reported past part-time employment as a "sampler" in a grocery store, a janitor, and, a deli worker in a grocery store. (T. 39-40, 52-54, 250).

In November 2002, plaintiff hurt her back while picking up a box at the grocery store deli where she last worked, and she received some workers' compensation benefits for that injury. (T. 39, 46-47). A November 2002 MRI indicated "protrusion with probable nerve root compression at L5-S1 on the right" (T. 334, 363),[2] and an October 2003 X-ray showed "lumbar instability" relating to tilting at L5-S1, L4-5, and L3-4 (T. 442, 446).[3] Plaintiff reported little relief from a variety of relatively

---

[2] A later MRI in 2003 did not reflect "any obvious neural compression," but showed some degenerative changes at L2-L3 and L3-L4 and slight central bulging at L3-L4. The reviewing doctor noted "[t]here are clinical signs and symptoms to suggest L5S1 radiculopathy on the left." (T. 445, 449). A nerve conduction study in November 2003 showed that plaintiff was within normal ranges for both lower extremities. (T. 442, 460-61).

[3] A March 2010 X-ray of plaintiff's lumbar spine was interpreted to show "a transitional L5 vertebral body" but was otherwise deemed "unremarkable." (T. 388). "Lumbosacral transitional vertebrae (LSTVs) are . . . congenital vertebral anomal[ies] of the L5-S1 junction in the spine. . . . [S]everal studies describe the occurrence of this anomaly in back pain populations . . . ." http://www.ncbi.nlm.nih.gov/pubmed/21951610.

conservative treatment methods for her radiating low back pain, including physical therapy and lumbar epidural steroid injections, but declined recommended disc fusion surgery. (T. 39-40, 47, 383, 451, 458).

In October 2005, plaintiff was involved in a head-on car collision, which resulted in her hospitalization for ten days, during which she had surgery to address fractures of her right leg, ankle, and heel. (T. 42-43, 523-24). Following the accident, plaintiff regularly used a cane for support while walking and standing, although the cane may have been prescribed earlier. (T. 41-43, 54, 63, 348, 383). Plaintiff also complained of migraine headaches and depression. (T. 51-52, 63-64, 390-92).

Plaintiff's ability to take prescribed medication or seek medical treatment was limited by lapses in her health coverage and her use of the proceeds of the settlement of her workers' compensation case "to save my house." (T. 46, 47, 49, 349). Between the time of the first and the second administrative hearing, plaintiff did not seek any treatment because she did not have current insurance. (T. 60, 62, 65).

Plaintiff's brief (at 2-14, Dkt. No. 13) provides a detailed statement of the medical and other evidence of record, which the defendant's brief (at 1-2, Dkt. No. 17), adopts, "with the exception of any inferences, arguments, or conclusions therein." Rather than further detailing the evidence in this case at the outset, the court will discuss the relevant facts below, as necessary to address the issues raised by plaintiff.

## IV. ALJ's DECISION

In remanding plaintiff's case following the ALJ's initial decision, the Appeals Council directed the ALJ, *inter alia*, to give further consideration to plaintiff's

maximum residual functional capacity and to her subjective complaints. (T. 101, 102). The Appeals Council noted that the ALJ's first opinion did not assess plaintiff's limitations with respect to her "ability to push, pull or bend[,]" nor did it address claimant's use of a cane. (T. 101). The ALJ was also instructed to obtain evidence from a vocational expert to clarify the effect of plaintiff's assessed limitations on her occupational base. (T. 102).

On remand, the ALJ determined that plaintiff met the insured status requirements of the Act through December 31, 2006, making her eligible for disability insurance benefits for as far back as her alleged onset date, to the extent she could establish disability prior to December 31, 2006. (T. 16). At the first step of the sequential disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since November 6, 2002, her alleged onset date. (T. 17).

At step two, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; migraine headaches; history of right knee, ankle, and heel fractures with surgery; and dysthymic disorder. (T. 17-19). At step three, the ALJ found that none of these impairments, either alone or in combination, met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 19).

The ALJ next determined plaintiff had the RFC to

sit for six hours in an eight-hour workday, stand and/or walk for a total of two hours in an eight-hour workday, and lift and/or carry no more than ten pounds in one hand. She needs a cane to ambulate but retains the ability to carry smaller objects in her free hand. She should not push or pull objects weighing more than ten pounds; should avoid climbing ropes, ladders, scaffolds, or walking on uneven terrain; and may only occasionally bend. She retains the

ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/ concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with others in order to perform simple tasks; and handle reasonable levels of simple, repetitive work-related stress defined as being able to make occasional decisions directly and related to performance of simple work.

(T. 19-20). The ALJ found at the fourth step of the sequential analysis that plaintiff was incapable of performing any of her past relevant work as a deli clerk or janitor. (T. 24).

At the step five, the ALJ acknowledged that plaintiff's ability to perform unskilled, sedentary work had been compromised by nonexertional limitations. (T. 25). To determine the extent to which these limitations eroded plaintiff's occupational base, the ALJ considered the testimony from the vocational expert ("VE"). (T. 25, 68-78). The VE testified that there were several jobs that existed in significant numbers which could be performed by a person of plaintiff's age, education, and vocational background, with the RFC specified by the ALJ, as quoted above. (T. 25, 73-74). Thus, because plaintiff was capable of performing jobs which existed in significant numbers in the national and regional economies, the ALJ found that plaintiff was not disabled under the Act. (T. 25-26).

## V.   ISSUES IN CONTENTION

Plaintiff advances the following arguments:

(1)   The ALJ erred in evaluating and failing to reconcile the medical opinion evidence, leading the ALJ to improperly determine that plaintiff did not require a sit/stand option and that plaintiff could occasionally bend; thereby failing to support the residual functional capacity determination by substantial evidence. (Pl.'s Br. at 1, 15-21).

8

(2)     The ALJ's credibility findings are unsupported by substantial evidence because the ALJ erred in analyzing the required factors when assessing plaintiff's credibility.  (Pl.'s Br. at 1, 21-23).

(3)     The ALJ's step five determination is unsupported by substantial evidence because the ALJ relied upon an incomplete hypothetical question posed to the vocational expert to determine there are other jobs in the national economy Plaintiff can perform.  (Pl.'s Br. at 1, 23-24).

This court agrees with the plaintiff that the ALJ erred in making his credibility and RFC determinations, which were not supported by substantial evidence.  As a result, the ALJ's step-five analysis, and the ultimate finding that plaintiff was not disabled, were tainted.  Accordingly, the court recommends a remand for further administrative proceedings to properly assess plaintiff's RFC and her credibility.

## VI.     RFC/CREDIBILITY

### A.     Legal Standards

#### 1.     RFC

Residual functional capacity ("RFC") is "what [the] individual can still do despite his or her limitations.  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."   A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran v. Barnhart*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3.    Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929(c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating

factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B. Analysis

#### 1. Sit/Stand Option

In essence, the ALJ found that plaintiff had the RFC to perform unskilled, sedentary work, with additional restrictions. The full range of sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 96-9p, 1996 WL 374185, at *3. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. SSR 96-9p, 1996 WL 374185, at *3.

" . . . [T]he concept of sedentary work contemplates substantial sitting . . ., [and] alternating between sitting and standing may not be within the concept of sedentary work." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citations omitted). An "individual [who] may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting . . . is not functionally capable of doing . . . the

prolonged sitting contemplated in the definition of sedentary work. . . . Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will." SSR 83-12, 1983 WL 31253, at *4.

In her December 18, 2009 function report, plaintiff reported that if she is sitting for too long, her back will hurt, and she needs to "move around a lot." (T. 244). During the administrative hearing on November 22, 2010, plaintiff testified that she could sit no longer than half an hour or an hour before she would need to get up and stretch her leg or back. (T. 41, 44).

On March 18, 2003, December 22, 2003, and February 1, 2005, Dr. Bruce E. Baker, an independent medical examiner in plaintiff's workers' compensation case, opined that, if plaintiff returned to work, necessary work restrictions would include alternating sitting and standing every 15 minutes. (T. 468, 481, 488). On September 1, 2005, independent examiner/Chiropractor James Dougherty reported, to the Workers' Compensation Board, that plaintiff needed a job where she would be able "to change positions as needed." (T. 496). On June 27, 2009, Dr. James Sawyer, plaintiff's primary care physician, noted that she was able to sit for a half hour to an hour before needing to get up and move around. (T. 352). On November 19, 2010, Dr. Margaret Sennett, another of plaintiff's treating doctors, opined that plaintiff could sit for 30 minutes at one time and four hours in an eight-hour workday; and that she would need a job permitting shifting positions at will from sitting, standing, or walking. (T. 462).

Although the ALJ "allocated some weight to Dr. Baker and D.C. Dougherty's

opinions to the extent that they support the conclusion that the claimant is capable of sedentary work[']" he " rejected their determinations that [plaintiff] requires the ability to alternate between sitting and standing positions because . . . the evidence in the record does not support such a conclusion." (T. 21). The ALJ "allocated great weight to Dr. Sawyer's opinion as it is consistent with his treatment notes" (T. 20), but did not address Dr. Sawyer's observations that plaintiff needed to get up and move around after sitting for half an hour to an hour. Dr. Sennett's opinions were given "limited evidentiary weight" by the ALJ because the significant limitations she identified for plaintiff were not fully supported by the doctor's reported clinical findings. (T. 21).

In elaborating on his finding that the medical evidence did not substantiate plaintiff's claimed need to alternate between sitting and standing positions,[4] the ALJ cited two medical reports from November 2002 (T. 332), and January 2003 (T. 335), stating that plaintiff experienced "minimal discomfort" and "no aggressive pain" in response to straight leg raises.[5] (T. 23). The ALJ ignored numerous other medical

---

[4] The ALJ noted that plaintiff had not sought any recent medical treatment for her allegedly worsening back and leg pain, and emphasized her concession, at the second administrative hearing on February 22, 2012, that she could "not prove anything." (T. 22). To put that admission in context, the plaintiff testified that her "back has gotten more painful" since the first hearing, "but not being able to see a doctor, I really can't prove anything." (T. 62). Defense counsel seems to acknowledge that, given the evidence in the record that plaintiff lacked health insurance for a considerable period of time, her failure to seek medical treatment does not provide significant evidence undermining the credibility of her statements regarding the severity of her symptoms. (Def.'s Brf. at 13).

[5] "The Straight Leg Raising (SLR) test has been used as the primary test to diagnosis lumbar disc herniations . . . ." Majlesi J, Togay H, Unalan H, Toprak S., *The sensitivity and specificity of the Slump and the Straight Leg Raising tests in patients with lumbar disc herniation*, http://www.ncbi.nlm.nih.gov/pubmed/18391677 . The ALJ stated that the cited medical reports also note that plaintiff's reflexes at the knees and ankles were "intact" or "symmetrical," (T. 23)–observations which have no apparent relevance to the plaintiff's ability to sit for prolonged periods without alternating between sitting or standing.

14

reports of positive clinical tests consistent with plaintiff's claims of lumbar pain, including the MRIs and X-ray reports cited above, as well as several positive straight leg raise and flip tests.[6]  (*See, e.g.*, T. 457 (2/27/2003 report of positive "flip test" with pain in the low back radiating to the left buttock); 451 (6/30/2003 positive straight leg raise on the left with low back pain, but negative straight leg raise on the right); 445 (10/24/2003 positive straight leg raises bilaterally with pain to the low back); 439 (12/16/2003 positive "flip tests" bilaterally); 427 (9/3/2004 weak positive straight leg raise and flip tests on the left, but negative on the right); 491 (2/1/2005 discomfort from straight leg raising greater on the left than on the right); 495 (9/1/2005 "sharp pain over the left lumbar and gluteal area and into the left posterior extremity" on left straight leg raise, lumbrosacral pain on right straight leg raise, and other positive tests for lumbrosacral pain)).

The ALJ stated that, in March 2004, plaintiff reported "improvement in her symptoms after use of a back brace."  (T. 23).  The plaintiff advised Dr. Stephen Robinson of "some improvement" after one month with the back brace, although "it doesn't completely take care of her pain."  (T. 433).  However, the ALJ's opinion ignores that, by August 2004, plaintiff told Dr. Robinson that she stopped wearing the brace because "it makes the pain worse."  (T. 429).

In bolstering his findings that the plaintiff's complaints about her symptoms

---

[6] The "flip test" involves "[p]assive extension of the knee with the patient in the erect position and the hip flexed [which] is reported to cause a sudden falling or flipping back of the trunk. . . .  [I]t remains a useful check of nerve root tension but only for patients with supine [straight leg raises] below 45 degrees.  The most reliable response was not a flip but the demonstration of pain on extension of the knee."  http://www.ncbi.nlm.nih.gov/pubmed/19564769.

were not credible, the ALJ noted a February 2009 examination by Dr. Sawyer, who reported that plaintiff "had some paraspinal tenderness on the left side and at the rhomboid muscle, but the remainder of the examination was normal." (T. 23, 349). Dr. Sawyer's observations focused on plaintiff's complaints of neck pain and his examination of plaintiff's **cervical** spine. (T. 349). Dr. Sawyer's February 2009 observations have little or no relevance to plaintiff's lower back pain and its effect on her ability to sit for prolonged periods without standing, particularly given Dr. Sawyer's explicit findings in June 2009 findings that plaintiff needed to get up and move around after sitting for between a half hour and an hour.

The only medical opinion consistent with the ALJ's finding that plaintiff did not need to alternate between sitting and standing was the March 5, 2010 finding of consultative examiner, Dr. Ganesh, that plaintiff had "no limitation for sitting." (T. 23, 386). Dr. Ganesh noted that plaintiff exhibited limited range of motion in her lumbar spine, but had negative straight leg raises bilaterally. He reported that plaintiff was able to get on and off the examination table without assistance and to rise from a chair without any difficulties. (T. 23, 385-86). Dr. Ganesh made no other clinical findings that provided support for his opinion that plaintiff could sit for a prolonged period without limitation; and he concluded that plaintiff's impairments caused her "severe limitations" for standing, walking, climbing, lifting, carrying, pushing, pulling, and bending. . . ." (T. 386).

In finding that the plaintiff could sit for six hours in an eight-hour workday without any further limitation, the ALJ selectively relied on Dr. Ganesh–a consulting

doctor who saw plaintiff once, and who provided little clinical evidence supporting his conclusion. In doing so, the ALJ rejected or ignored considerable contrary medical evidence from other sources, including a treating physician, Dr. Sawyer, whose opinion the ALJ gave "great weight." *See* 20 C.F.R. §§ 404.1527(c)(2)(I), 416.927(c)(2)(I) ("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"). While the ALJ explained why he rejected the contrary findings of two other consulting examiners and Dr. Sennett, he completely ignored the contrary opinion of Dr. Sawyer. *See* SSR 96-8p, 1996 WL 374184, at *7 ("[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted"); *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from [ALJs] that do not comprehensively set forth reasons for the weight assigned . . ."). The ALJ erred in his evaluation of Dr. Sawyer's opinion under the treating physician rule. Moreover, in attempting to marshal other medical evidence supporting his position with respect to plaintiff's ability to sit, the ALJ misstated the evidence or selectively presented the evidence supporting his position, while ignoring contrary evidence. *See, e.g., Royal v. Astrue*, No. 5:11-CV-456 (GTS/ESH), 2012 WL 5449610, at *6 (N.D.N.Y. Oct. 2, 2012) (while ALJs are entitled to resolve conflicts in the record, they cannot pick and

choose only evidence from the same sources that supports a particular conclusion) (*citing, inter alia, Fiorello v. Heckler*, 725 F.2d 174, 175-76 (2d Cir. 1983)) (Rep't-Rec.), *adopted*, 2012 WL 5438945 (N.D.N.Y. Nov. 7, 2012). Accordingly, this case must be remanded for further consideration of the medical evidence with respect to the limitations on plaintiff's ability to sit for prolonged periods without alternating between sitting and standing, or otherwise changing positions.[7]

The ALJ's selective observations about plaintiff's acknowledged activities of daily living do not support his credibility determination or his RFC finding with respect to plaintiff's ability to meet the sitting requirements for sedentary work. The ALJ cited plaintiff's statements, in a December 2009 function report that "she could attend to a majority of her personal needs, prepare meals, do laundry with assistance, drive a motor vehicle, travel independently, go shopping, . . . watch television, [and] play cards occasionally . . . ." (T. 24). However, in that same function report, plaintiff reported that, when her back was "really hurting," her husband must help her up and down the stairs to the bathroom, in and out of the bath tub, on and off the toilet. (T. 240-41). Plaintiff reported cooking only one to three times per week for 15 minutes to an hour, and had to sit down when food preparation required an hour. She could not bend down to put food in the oven or clothes in the dryer. (T. 241, 242, 249). With respect to driving, plaintiff testified that she sometimes has difficulty driving because

---

[7] To the extent the Commissioner concludes, on remand, that plaintiff's limitations, *e.g.*, with respect to sitting, improved more recently, the Commissioner should consider whether plaintiff was disabled for some closed period of one year or more since plaintiff's claimed November 2002 onset date.

of her back pain, and she had to limit her distances and travel time. (T. 38).[8]

Taken in context, and in light of the medical evidence corroborating her limitations as to sitting, plaintiff's admissions about her daily activities do not significantly undermine the credibility of her statements, noted above, that after sitting for a half hour or an hour, she needs to get up and move around. "[I]t is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Stoesser v. Comm'r of Soc. Sec.*, No. 08-CV-643 (GLS/VEB), 2011 WL 381949, at *6-7 (N.D.N.Y. Jan. 19, 2011) (claimant's daily activities–including cleaning the house, watching television and playing video games, cooking simple meals, and shopping for groceries–did not support the ALJ's finding that plaintiff could perform sedentary work over an eight-hour workday in light of plaintiff's testimony that he could not sit for more than 30 minutes to an hour without standing up) (Rep't-Rec.), *adopted*, 2011 WL 381941 (N.D.N.Y. Feb. 3, 2011). *See also, Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) (the ALJ erred when he concluded that plaintiff could meet the sitting requirements of sedentary work because she cooked and shopped for herself, used public transportation, and managed to remain seated for one long plane ride).

## 2. Plaintiff's Ability to Bend

"According to the SSA's rulings, an inability to bend, stoop, crouch, or kneel

---

[8] In similarly selective fashion, the ALJ stated that plaintiff admitted to Dr. Kristen Barry that "she continues to drive a motor vehicle, attend to her personal needs, cook, . . . and watch television." (T. 24). Dr. Barry reported that plaintiff "does a little bit of cooking . . . [and] is very limited in her ability to do cleaning and laundry." (T. 391).

more than occasionally would not substantially affect an individual's ability to perform light or sedentary work." *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, at *17 (E.D.N.Y. Sept. 11, 2012) (citation omitted); SSR 85-15, 1985 WL 56857, at *7 ("If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact."). However, "[a] complete inability to stoop[9] would significantly erode the unskilled sedentary occupation base and a finding that the individual is disabled would usually apply." *Molina v. Barnhart*, No. 04 Civ. 3201, 2005 WL 2035959, at *8 (S.D.N.Y. Aug. 17, 2005) (quoting SSR 96-9p, 1996 WL 374185, at *8 ("An ability to stoop occasionally; *i.e.*, from very little up to one-third of the time, is required in most unskilled sedentary occupations.")).

Plaintiff testified that bending bothered her back (T. 41) and consistently reported that she could not bend to perform tasks such as putting clothes in the dryer or food into the oven. (T. 43, 241, 249). After being directed by the Appeals Council to assess plaintiff's ability to bend on remand (T. 101), the ALJ found that she could bend "occasionally" with little supporting discussion (T. 20).

The ALJ purported to give "great weight" to the July 2009 opinion of treating physician, Dr. Sawyer that, *inter alia*, plaintiff should "avoid bending." (T. 20). In fact, Dr. Sawyer's July 2009 report stated twice that plaintiff was "unable to bend." (T. 352, 353). The ALJ's failure to accurately represent the opinion of this treating doctor, or to explain how he reconciled Dr. Sawyer's opinion that plaintiff was

---

[9] "Stooping" means "bending the body downward and forward by bending the spine at the waist." SSR 83-14, 1983 WL 31254, at *2.

"unable to bend" with the ALJ's finding that she could "only occasionally bend" clearly violates the treating physician rule. The ALJ similarly mischaracterized the opinion of consulting Chiropractor Doughterty–stating that D.C. Dougherty concluded that plaintiff should "avoid bending," when he actually found that plaintiff should do "no bending." (T. 21, 496). The ALJ accurately reported that Dr. Baker reported three times that plaintiff could do "no bending" (T. 21, 468, 481, 488) and that Dr. Ganesh concluded that plaintiff had a "severe limitation" for bending (T. 20, 386),[10] but did not reconcile their opinions with his RFC finding that plaintiff could "occasionally" bend–*i.e.*, up to one-third of the workday.[11]

The court concludes that the ALJ failed to properly evaluate the medical opinion evidence relating to plaintiff's ability to bend or stoop. On remand, the Commissioner should properly address the totality of the medical opinion and other evidence with respect to plaintiff's limitations in that area.

## VII. STEP FIVE/VOCATIONAL EXPERT

### A. Legal Standards

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case,

---

[10] The medical providers documented clinical observations of plaintiff's substantial limitations with respect to lumbar spine flexion, or the ability to bend at the waist. (*See, e.g.*, T. 494 (per D.C. Dougherty, plaintiff's lumbopelvic flexion limited to 30 of 90 degrees); T. 385-86 (per Dr. Ganesh, plaintiff's lumbar flexion limited to 30 degrees); T. 470, 483, 490 (Dr. Baker)).

[11] The ALJ accorded limited evidentiary weight to the opinions of Dr. Sennett and did not mention that she found that plaintiff could stoop or bend "rarely." (T. 20-21, 463).

the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE"). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id*. at 276-277. Conversely, a VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability. *See DeLeon v. Sec'y of Health and Human Servs.*, 734 F.2d. 930, 936 (2d Cir. 1984) (finding that, as a result of the ALJ's failure to present the full extent of the claimant's physical disabilities to a vocational consultant, the record provided no basis for drawing conclusions about whether the claimant's impairments rendered him disabled).

## B.     Analysis

The ALJ's errors in reaching his RFC determination also tainted his analysis at

step five of the sequential disability analysis.  The ALJ's hypothetical question to the

VE assumed an RFC of someone who could "only occasionally bend" and who could

sit for six hours of an eight-hour workday with no further limitations. (T. 73).

Because these aspects of the ALJ's RFC determination were reached in error and were

not supported by substantial evidence, the VE's opinion that a person with that RFC

could perform particular unskilled, sedentary  jobs could not support the ALJ's

ultimate conclusion that plaintiff was not disabled.[12]

In short, the ALJ failed, at step five, to pose to the VE, and rely upon, proper

hypothetical questions reflecting an RFC determination that was supported by

substantial evidence.  On remand, the ALJ must perform a proper RFC/credibility

analysis, particularly with respect to plaintiff's limitations with respect to sitting and

bending, and formulate proper hypothetical questions reflecting an RFC determination

supported by substantial evidence.

## VIII.  NATURE OF REMAND

"When there are gaps in the administrative record or the ALJ has applied an

improper legal standard . . . remand to the Secretary for further development of the

evidence" is generally appropriate.  *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.

1980).  However, it is possible, on the current record, that the ALJ could make a

proper RFC determination involving further limitations with respect to plaintiff's

---

[12] It should be noted that, in response to a question from plaintiff's counsel, the VE testified that, in her opinion, the plaintiff could still perform the identified jobs if she could only bend "rarely" as opposed to "occasionally."  (T. 77).  Because the ALJ did not resolve the considerable medical evidence that plaintiff could not bend at all in the work setting, the VE's testimony would not render harmless the ALJ's errors relating to his finding that plaintiff could bend occasionally.

ability to bend and/or sit for prolonged periods that would not preclude her from performing some unskilled sedentary jobs that exist in significant numbers in the national economy. Thus, this court cannot conclude that "substantial evidence on the record as a whole indicates that the [plaintiff] is disabled[,]" and I cannot recommend a remand solely for the determination of benefits. *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996). Given the extensive delays in plaintiff's administrative case to date, the court urges the Commissioner to expedite proceedings on remand.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper determination of plaintiff's residual functional capacity and her credibility, and other further proceedings, consistent with this Report.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: October 23, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge